UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                            :

UNITED STATES OF AMERICA

                            :

         - v. -                                      No. 22 Cr. 138 (RA)

                            :

NEIL PHILLIPS,

                            :

            Defendant.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas Burnett
Kiersten Fletcher
Noah Solowiejczyk
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 3

    A.  The FX Market................................................................................................ 3

    B.  Glen Point and the One Touch Option........................................................... 3

    C.  Phillips's Criminal Scheme............................................................................ 5

    D.  The Indictment .............................................................................................. 8

ARGUMENT ............................................................................................................ 8

I.   The Motion to Dismiss the CEA Counts Should be Denied.................................. 8

    A.  Applicable Law .............................................................................................. 8

    B.  The Indictment Alleges a Manipulative and Deceptive Scheme in Connection with a Swap........................................................................................................... 9

    C.  The CEA Counts Do Not Allege an Impermissibly Extraterritorial Application of the CEA............................................................................................................ 15

        *1.  Section 6(c)(1) and Rule 180.1 Have Both Domestic and Extraterritorial Reach as Applied to Swaps* ............................................................... 16

        *2.  The CEA Counts Are a Domestic Application of the Statute* ................. 18

        *3.  In the Alternative, the CEA Counts Are a Permissible Extraterritorial Application of the Statute* ...................................................................... 21

    D.  The CEA Counts Allege Violations of Section 6(c)(1) and Rule 180.1 .................... 25

        *1.  The CEA Counts Allege a Violation of Section 6(c)(1) and Rule 180.1* ............. 25

        *2.  Phillips Wrongly Relies on Elements From a Different Statute* ........................ 28

        *3.  The CEA Counts Do Not Require Deceptive Conduct Beyond Open Market Transactions with Manipulative Intent* ...................................................... 31

        *4.  The CEA Counts Allege Manipulative Intent and Deceptive Conduct* ................ 34

II.  The Motion to Dismiss the Wire Fraud Counts Should be Denied ........................................ 35

III. The Constitutional Challenge to the Indictment Should be Denied ...................................... 40

    A.  Applicable Law................................................................................................ 40

    B.  The Charges in the Indictment Do Not Violate the Due Process Clause.................... 41

CONCLUSION........................................................................................................... 45

# TABLE OF AUTHORITIES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............... 26, 27, 32, 33, 34, 37, 42

*BP Am. Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022) ................................................ 12

*CFTC v. Amaranth*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) ...................................... 32

*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) ...................................... 31-32

*CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ........................ 28, 30, 31, 42

*CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018) ............................... 13, 14

*CFTC v. Monex Credit Co.*, 311 F. Supp. 3d 1173 (C.D. Cal. 2018) ........................ 10

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) ........................ 11

*CFTC v. Wilson,* 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............................ 33

*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) ...................................... 13

*Costello v. United States*, 350 U.S. 359 (1956) ...................................................... 9

*FAA v. Cooper*, 566 U.S. 284 (2011) .................................................................... 29

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ................................................ 27

*Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013) .................................................... 12

*In re Amaranth Nat. Gas Comm. Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................ 28

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ... 11

*In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023) .................. 17, 18, 21

*Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2014) .......................................................... 30

*Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395 (2d Cir. 2014) .................... 21, 22

*Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) ................................................ 42

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ........................................................ 41

*Morisette v. United States*, 342 U.S. 246 (1952) .................................................... 27

*Morrison v. National Australia Bank*, 561 U.S. 247 (2010) .................................... 15

*Laydon v. Coöperatieve Rabobank U.A.* 55 F.4th 86 (2d Cir. 2022) ........................ 20

*Perez v. United States*, 402 U.S. 146 (1971) ...................................................... 22-23

*Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) ........................ 28, 42

*Prime Int'l Trading v. BP PLC*, 937 F.3d 94 (2d Cir. 2019) .................... 13, 16, 17, 18, 19, 21

*RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090 (2016) ................................ 16

*S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) ...................................... 26, 32, 42

*SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) ............................ 26, 32

*SEC v. Vali Mgmt.*, 2022 WL 2155094 (2d Cir. 2022) .................................. 26, 30, 32

*Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64 (2d Cir. 2021) .................... 26, 32, 33, 34

*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) ...................... 42

*SIFMA v. CFTC*, 67 F. Supp. 3d 373 (D.D.C. 2014) ..................................................... 17, 21, 23

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) ........................................................ 25

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .......................................... 35, 37, 43

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008) ................................... 44

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) ........................................ 38

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) ...................................... 8

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ....................................... 35, 9

*United States v. Epksamp*, 832 F.3d 154 (2d Cir. (2016) ...................................... 16

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ........................................ 40

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) ............................................ 37

*United States v. Gen. Dyn. Corp.*, 644 F. Supp. 1497 (C.D. Cal. 1986) ................. 44

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ..................................... 35

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ....................................... 40

*United States v. Harris*, 821 F.2d 589 (5th Cir. 2016) .......................................... 36

*United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020) ..................................... 40, 42, 44

*United States v. Juwa*,  508 F.3d 694 (2d Cir. 2007) ............................................. 9

*United States v. Leslie*, 103 F.3d 1093 (2d Cir. 1997) ......................................... 23

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ........................................... 39

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990) .................................. 41

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) ...................................... 33

*United States v. Naiman*, 211 F.3d 40 (2d Cir. 2000) ........................................ 36-37

*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) ....................................... 15-16

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ......................................... 15, 34, 9

*United States v. Prado*, 933 F.3d 121 (2d Cir. 2019) ........................................... 15

*United States v. Race*, 632 F.2d 1114 (4th Cir. 1980) .......................................... 44

*United States v. Radley*, 637 F.3d 177 (5th Cir. 2011) ...................................... 11, 12

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) .................................. 27, 32, 35, 37

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ......................................... 25

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) ................................... 27, 32, 34, 35

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) .......................................... 41

*United States v. Shellef*, 732 F. Supp. 2d 42 (E.D.N.Y. 2010) ............................... 44

*United States v. Torres,* 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ..................... 8

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) ...................................... 9

*United States v. Vilar*, 7298 F.3d 62 (2d Cir. 2013) .............................................. 16

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ............................................ 9

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ...................................................................... 10, 35, 8

*Univ. Health Servs. v. United States*, 579 U.S. 176 (2016) ...................................................................... 36

Neil Phillips manipulated a global exchange rate and deceived American financial institutions, all to guarantee his hedge fund a $20 million payday.  The scheme took place in the dead of night, right after Christmas.  Using his access to vast amounts of capital, Phillips sold $725 million in exchange for South African rand.  His goal—which he stated clearly to a co-conspirator—was to push down the value of the dollar relative to the rand, so the exchange rate would momentarily fall below 12.50 rand per dollar.

Phillips's motivation was simple: he wanted to cheat.  Phillips managed funds that, pursuant to an options contract, were entitled to a $20 million payment from an American bank if the exchange rate fell below that threshold.  So he took matters into his own hands.  He secretly drove the exchange rate just low enough to trigger the option, then deceived other parties involved in the option—including another American bank—telling them that the magic number had been reached, without disclosing that the exchange rate had fallen not due to normal market forces, but because of his own manipulative trading.

In his motion to dismiss, Phillips tries to garb himself in the Constitution, claiming that prosecuting him for this deceptive scheme offends fundamental principles of fair notice.  But the clothes don't fit.  Phillips violated settled rules that prohibit deceptive schemes in options markets and obtaining money by making misleading statements; rules that Phillips undoubtedly understood as a sophisticated investor who was registered with, and ran a fund that was registered with, the Commodity Futures Trading Commission.

Since shortly after the 2008 financial crisis, the Commodity Exchange Act has made it a crime to engage in deceptive schemes in connection with any swap, including options based on foreign-currency exchange rates.  Courts in this Circuit have long recognized that deceptive

schemes include those that involve engaging in open-market trading strategies with the intent to manipulate prices. The logic of these decisions is straightforward: market participants expect that prices are set by natural forces of supply and demand, not the whims of manipulators, so a secret plan to intentionally manipulate prices is a form of deception.

Phillips broke that settled rule. By using his massive buying power on the night of a major holiday, he was able to give a false impression that normal market forces had caused the dollar/rand exchange rate to fall below 12.50, then further deceived other relevant parties to the option by telling them the magic number had been reached, without disclosing that his own manipulative trading was the cause. Phillips's claim that it is novel to charge this plainly deceptive scheme as a deceptive scheme in violation of the Commodity Exchange Act is at odds with the text of the relevant statutes and long-settled law.

Phillips's attempt to characterize the wire-fraud charges is novel are equally off base. The wire-fraud statute has long barred people from defrauding others through misleading statements, including misleading half truths. Phillips violated that prohibition. Under the terms of the options contract, Phillips's hedge fund was responsible for determining when the option had been triggered and doing so in "good faith" and a "commercially reasonable manner." But after manipulating the exchange rate, Phillips directed his employees to confirm to other parties that the option had been triggered, without disclosing that he made that determination based the results of his own manipulative trading. Those confirmations were doubly misleading: They implied that Glen Point was acting in "good faith" and a "commercially reasonable manner," when in reality Phillips had cheated. And they implied that the option had been triggered as a result of natural market forces, rather than Phillips's manipulation. It should come as no surprise that misleading another person into parting with millions of dollars is a crime. Phillips's motion to dismiss should be denied.

## **BACKGROUND**

### A. **The FX Market**

The foreign currency exchange ("FX") market is a global market, in which people and companies trade currencies in pairs. Indictment ¶ 5. The relative value of the currencies in each pair is expressed as a ratio, commonly referred to as an "exchange rate." *Id.* A common type of FX trade is a "spot" trade, where a party agrees to sell one currency for another, at an agreed-upon exchange rate and quantity. *Id.* ¶ 8. The exchange of the currencies, known as the "settlement" of the trade, typically takes place two business days after the agreement. *Id.* When a spot trade involves the United States dollar ("USD"), settlement often occurs through a particular bank in Manhattan (the "Settlement Bank"), with the USD portion of each trade flowing through bank accounts at the Federal Reserve Bank of New York. *Id.* ¶ 9.

In addition to making "spot" trades, parties in FX markets also trade a wide assortment of options. One type of FX option is a "one touch" digital barrier option. *Id.* ¶ 10. In a one touch digital barrier option, one party pays a premium and, in return, the counterparty promises that it will pay a specified amount (known as the "notional value") if the exchange rate of a particular currency pair reaches (or "touches") a specified rate (the "barrier") by a certain date. *Id.* ¶¶ 10-11. If the exchange rate does not touch the barrier by that specified date, the counterparty keeps the premium and is not required to pay the notional value. *Id.*

### B. **Glen Point and the One Touch Option**

Neil Phillips was the co-founder and co-Chief Investment Officer of a hedge fund that focused on FX trading. *Id.* ¶ 4. The hedge fund, known as Glen Point Capital ("Glen Point"), was headquartered in the United Kingdom, but consisted of two entities—Glen Point Capital LLC, in London, and Glen Point Capital Advisors LP, in New York—that jointly managed investments for multiple commodity pools, which are pools of funds from investors for investing in commodity

and foreign-exchange markets. *See id.* ¶¶ 3-4, 12, 19. Glen Point was registered with the Commodity Futures Trading Commission ("CFTC") as a "commodity pool operator." *Id.* ¶ 4. And Phillips was personally registered with the CFTC as an associate of Glen Point. *Id.* ¶ 4.

One of the currency pairs in which Glen Point traded was the pairing of the United States dollar and the South African rand ("ZAR"). *Id.* ¶¶ 6, 27. As of late October 2017, the USD/ZAR exchange rate was hovering over 14.00, which meant that one dollar was worth slightly more than 14.00 ZAR. *Id.* ¶ 14. Glen Point staked out a position on the premise that, by early 2018, the value of the dollar would fall relative to the rand. Specifically, on October 30, 2017, Glen Point purchased a one touch digital barrier option (the "OT Option") for the USD/ZAR currency pair, with a notional value of $20 million, a barrier rate of 12.50, and an expiration date of January 2, 2018. *Id.* ¶ 10. So if the USD/ZAR exchange rate fell to or below 12.50 at any point before January 2, 2018, the pools Glen Point managed would receive a $20 million payment. *Id.*

Glen Point was involved with two American financial institutions in connection with the OT Option. The fund began by using a financial services firm (the "Intermediary Firm") to find a willing counterparty for the option. *Id.* ¶ 11. The Intermediary Firm found an American bank ("American Bank-1") for that role and arranged for American Bank-1 to take the opposite side the OT Option. *Id.* As a result, American Bank-1 would be required to pay Glen Point's funds $20 million if, at some point before January 2, 2018, the USD/ZAR exchange rate fell below 12.50. *Id.* Because the Intermediary Firm allowed its clients to maintain anonymity, neither Glen Point nor American Bank-1 knew the identity of their respective counterparty to the transaction. *Id.*

After the Intermediary Firm found a willing counterparty in American Bank-1, Glen Point used a second bank headquartered in the United States ("American Bank-2"), to act as its prime broker for the OT Option. *Id.* ¶ 13. This meant American Bank-2 sent Glen Point a contract

embodying the terms of the OT Option, with American Bank-2 listed as the "seller" of the OT Option—not the Intermediary Firm or American Bank-1.  *See id.*  The contract stated that Glen Point would serve as the "Calculation Agent," which meant that it would be charged with determining whether the 12.50 USD/ZAR had been met.  *Id.*  The contract required Glen Point, as Calculation Agent, to "act[] in good faith and in a commercially reasonable manner."  *Id.*  The agreement also incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc., which reiterates that the "occurrence of a [b]arrier [e]vent shall be determined in good faith and in a commercially reasonable manner." *Id.*

Practically speaking, this arrangement meant that, if the OT Option's barrier was triggered, American Bank-2 would make the $20 million payment to Glen Point's funds, then be reimbursed by transfers from American Bank-2.  *See id.* ¶ 25.  Glen Point specified in its agreements with American Bank-2 that, if the OT Option proved to be a success, $15,660,000 should go to one set of Glen Point's funds, with the remaining $4,340,000 going to a fund operated by a Glen Point client ("Client Fund-1").  *See id.* ¶ 12.

## C.     Phillips's Criminal Scheme

The investment theory behind the OT Option was related to anticipated political events in South Africa.  The African National Congress ("ANC") is a major political party in South Africa that it has governed the country since South Africa's first post-apartheid election.  When Glen Point created the OT Option, the ANC was scheduled to hold party leadership elections in mid-December 2017.  *See id.* ¶ 27.  The idea behind OT Option, which was set to expire two weeks after the election, was that a particular candidate ("Candidate-1") was likely to become president of the ANC, and that the rand would strengthen relative to the dollar as a result of that victory, lowering the exchange rate below 12.50 USD/ZAR.  *Id.*

Political events unfolded as Glen Point had hoped, but they did not shift the exchange rate

enough to hit the barrier in the OT Option. In the weeks before the ANC leadership election, the USD/ZAR exchange rate fluctuated between 14.50 and approximately 13.15—far above the 12.50 barrier. *Id.* ¶ 14. That changed on December 18, 2017, when the ANC announced that Candidate-1 had been elected the ANC's president. *Id.* ¶ 15. The market reacted quickly, with the USD/ZAR exchange rate falling as low 12.52 that day. *Id.* But the exchange rate did not fall below 12.50, and it remained over that threshold between December 19 and Christmas day. *Id.* ¶ 16.

With the OT Option set to expire in a matter of days, Phillips took matters into his own hands. He intentionally and artificially manipulating the USD/ZAR exchange rate, so it would fall trigger the OT Option. *Id.* ¶ 17. Phillips carried out that plan by selling massive quantities of dollars for rand in the dead of night right after Christmas, with the stated objective of selling just enough dollars to drive the exchange rate below 12.50, then to stop selling, so he would not have to buy any more rand than was necessary to trigger the $20 million payout. *See id.* ¶¶ 17-18.

The scheme began shortly before midnight London time on December 25, 2017, Christmas day. *Id.* ¶ 18. Phillips, who was in South Africa at the time, reached out over Bloomberg chat to a banker in Singapore ("CC-1") who regularly did business with Glen Point. *Id.* Phillips directed CC-1 to begin selling dollars for rand, with the express goal of driving the USD/ZAR exchange rate below 12.50. *Id.* ¶¶ 18, 20. Phillips had CC-1 sell dollars in batches, constantly checking in to see how much more would be needed to drive the exchange rate below 12.50. For example:

- At approximately 12:09 a.m. on December 26,2017, Phillips wrote, "my aim is to trade thru 50," and CC-1 responded, "Ok sure." *Id.* ¶ 20(a).

- At approximately 12:19 a.m., Phillips asked CC-1 "[h]ow much liquidity" CC-1 thought there was "between now and 50." CC-1 responded, in substance and in part, that "we are the only sellers in the market." *Id.* ¶ 20(c).

- At approximately 12:25 a.m., Phillips wrote, "[n]eed it to trade thru 50. 4990 is fine." *Id.* ¶ 20(d).

- At approximately 12:31 a.m., CC-1 told Phillips that he had sold $450 million for rand and that the lowest the exchange rate had gone was 12.5050. Phillips responded by asking, "[h]ow much more u think to break 50?" *Id.* ¶ 20(f).

- At approximately 12:42 a.m., Phillips instructed CC-1 to sell another $100 million for rand, urging him to "try to get it thru now." CC-1 responded that he would let Phillips "know as soon as we sell any below the figure." *Id.* ¶ 20(g).

Finally, at approximately 12:44 a.m., CC-1 let Phillips know "we just sold at 4990." *Id.* ¶ 20(h). Phillips immediately responded, "Pls. [please] get me prof [proof] of the print. And stip [sic] stop." *Id.* In all, Phillips sold over $725 million for rand in under an hour, to drive the exchange rate momentarily below 12.50. *Id.* ¶ 21. Soon after Phillips's manipulative trading ended, the USD/ZAR exchange rate returned to levels above 12.50. *Id.* ¶ 22.

Phillips moved quickly to secure his payout. Minutes after manipulating the exchange rate, he told a Glen Point employee in London to notify the Intermediary Firm that the OT Option had been triggered. *Id.* ¶ 23. The employee contacted an employee at the Intermediary Firm to confirm that the barrier had been reached, but did not reveal that the triggering event occurred because Phillips had manipulated the exchange rate. *Id.* Later that morning, another Glen Point employee notified American Bank-2 that the "option level of 12.50 was hit yesterday," also failing to tell American Bank-2 that Phillips had manipulated the exchange rate to hit that barrier. *Id.*

As a result of Phillips's scheme, American Bank-1 made the $20 million payment under the OT Option, and Glen Points funds, including Client Fund-1, received their ill-gotten rewards. *Id.* ¶ 25. American Bank-1 and American Bank-2 made wire transfers through New York to facilitate the payments. *Id.*

### D. The Indictment

On March 3, 2022, a grand jury sitting in this District returned an indictment (the "Indictment") charging Phillips in four counts. Counts One and Two (the "Commodities Exchange Act Counts" or "CEA Counts") charge Phillips with conspiring to commit commodities fraud, in violation of Title 18, United States Code, Section 371, and commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1. Counts Three and Four (the "Wire Fraud Counts") charge Phillips with conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.

## ARGUMENT

## I. The Motion to Dismiss the CEA Counts Should be Denied

### A. Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id*. That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956). It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009)*. This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

## B. The Indictment Alleges a Manipulative and Deceptive Scheme in Connection with a Swap

"In the wake of the financial crisis of 2008, Congress . . . provided the [CFTC] with additional and broad authority to prohibit fraud and manipulation." 76 Fed. Reg. 41,398 (2011). This new statutory authority—in Section 6(c)(1) of the Commodities Exchange Act ("Section 6(c)(1)")—made it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance," in violation of rules promulgated by the CFTC. 7 U.S.C. § 9(1). The CFTC gave force to that law through 17 C.F.R. § 180.1 ("Rule 180.1"), which prohibits, "in connection with any swap," using "any manipulative device, scheme or artifice to defraud," making any "untrue or

misleading statement" of fact or omission, or engaging in "any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1(a).

The Indictment properly alleges that Phillips violated the CEA and conspired to do the same. The Indictment alleges that Phillips engaged in a criminal scheme to trigger the OT Option by using "manipulative device, scheme or artifice to defraud," making "untrue or misleading" statements of fact or omissions, and engaging in actions that "operate[d] as a fraud or deceit" on others. Indictment ¶¶ 30-35. The Indictment also alleges that this misconduct occurred "in connection with the [OT Option]," which is a type of swap. *Id.* These allegations are sufficient at the motion to dismiss stage because they "track the language of the statute" and give the defendant fair notice of the charge against him, so he can defend his case and plead double jeopardy at any future proceeding. *Wedd*, 993 F.3d at 120. Indeed, the Indictment goes well beyond the requirements of Rule 7 and the Fifth Amendment by including factual allegations that describe the nature of Phillips's illegal scheme.

Phillips's claim that the Indictment does not allege conduct "involving a transaction covered by the CEA" misapprehends both the Indictment and the law. Start with the argument that "FX spot transactions are not covered by the CEA" and so "do not, *on their own*, provide a basis for claims under the statute." Mot. at 8 (emphasis added). This is a red herring: the CEA Counts allege a deceptive scheme in connection with triggering the OT Option, not that Phillips's spot trades, on their own, were criminal. Indictment ¶¶ 30-35.[1]

---

[1] The premise that FX spot transactions are not subject to Section 6(c)(1) and Rule 180.1 is also not necessarily correct. Those laws are not limited to commodities regulated by the CFTC, but rather apply "broadly to any swap, or a contract of sale of any commodity in interstate commerce." *See CFTC v. Monex Credit Co.*, 311 F. Supp. 3d 1173, 1184-85 (C.D. Cal. 2018). The Court, however, need not reach the issue because the allegations in the Indictment charge Phillips with manipulation in connection with a swap.

One touch digital options are "swap[s]" under the CEA. The statute defines "swap" to include "any agreement . . . that is [an] option of any kind" based on the value of, among other things "[one] or more . . . currencies," 7 U.S.C. § 1a(47)(i), and specifies that the statute applies to "option[s]" in "foreign currency," *id.* § 2(c)(2)(A)-(B); *see* 77 Fed. Reg. 48208-01, 48254 (2012) ("[T]he statutory swap definition includes options, and it expressly enumerates foreign currency options."). Regulations also specify that "[t]he term swap" includes "foreign currency option[s], foreign exchange option[s] and foreign exchange rate option[s]." 17 C.F.R. § 240.3a69-2. Thus, Phillips's illegal scheme to trigger the OT Option was an illegal scheme to trigger a swap.

That Phillips's deceptive scheme relied, in part, on using spot transactions does not alter the analysis. FX spot transactions were simply one of the means to accomplish the illegal end of carrying out a deceptive scheme in connection with triggering the OT Option. Courts have long recognized that, under the CEA, it is unlawful to take actions with one type of product (even if that product is not regulated) to manipulate another product covered by the statute. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Cv. 7789 (LGS), 2016 WL 5108131, at *18 (S.D.N.Y. Sept. 20, 2016) (noting "[c]ourts have allowed . . . CEA manipulation claims . . . where the allegedly manipulated market was influenced by actions taken in another market"); *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 243 (S.D.N.Y. 2012) (finding that use of exempt product to manipulate non-exempt product was actionable). That makes sense: nothing in the CEA gives a free pass to deceptive conduct in connection with foreign-currency options— which are expressly covered as "swaps" under the statute—simply because that manipulation also involved spot transactions. *See* 76 Fed. Reg. 41,381, at 41,406 (final rulemaking guidance explaining that Rule 180.1 applies to "cross-market manipulation").

The lone CEA case Phillips cites, *United States v. Radley*, 637 F.3d 177 (5th Cir. 2011), is

not to the contrary. Mot. at 9-10. That decision dismissed CEA counts that charged defendants with manipulating transactions that were exempt from regulation under the statute. *See id.* at 181-83. This would be akin to a charge that Phillips *solely* manipulated FX spot transactions. The charges here, however, are fundamentally different: they are based on Phillips's participation in a scheme to commit fraud in connection with a swap, and FX spot transactions were only one means by which he carried out that unlawful scheme..[2]

Phillips's next argument—that his illegal scheme was not "in connection with a swap" because it did not coincide with the creation of a swap, Mot. at 10-12—is at odds with the language of the CEA. Section 6(c)(1) and Rule 180.1 prohibit fraud "in connection with any swap." There is no textual requirement that the fraudulent acts occur in connection with the purchase, sale, or creation of the swap. Consistent with the text, Section 6(c)(1) and Rule 180.1 "reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, *pendency, or termination* of any swap." 76 Fed. Reg. 41,398, 41,406 (emphasis added).

It would make little sense to limit swap-based manipulation claims to the purchase or sale of a swap. Unlike in the context of a stocks, the critical economic moments for swaps occur not only when they are purchased and sold, but also when they are triggered or not triggered. A key economic question for the OT Option, for instance, was whether it would be triggered. There is no reason to read the CEA as allowing fraudulent conduct with respect to that critical issue.

---

[2] Phillips is also wrong to rely on *BP Am. Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022), and *Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013). Those cases addressed the scope of the Federal Energy Regulatory Commission's authority and had nothing to do with the CEA. They also do not support Phillips's position. Both held that FERC lacked authority to impose fines for transactions outside its jurisdiction, simply because those transactions were in connection with jurisdictional transactions. *See, e.g.*, *BP Am.*, 52 F.4th at 217, 221-22. Neither addressed the situation at issue in Phillips's case, where transactions outside of the agency's authority were used to manipulate transactions that fall under the agency's jurisdiction.

The Indictment lines up squarely with the text of the CEA. The Indictment alleges that Phillips's scheme was in connection with a swap because it was calculated to trigger the OT Option before that option expired. This falls within Rule 180.1's reach because it relates to the "pendency" and "termination" of the swap. 76 Fed. Reg. 41,398, at 41,406 ("The Commission interprets the words 'in connection with' broadly, not technically or restrictively."); *see also id.* at 41,401 (explaining that Rule 180.1 applies to any "fraud or manipulation that has the potential to affect . . . swaps markets or participants in these markets").

Phillips's argument to the contrary is based on the wrong statute. Phillips points to the Securities Exchange Act and Rule 10b-5, which prohibit fraud "in connection with the *purchase or sale* of any security." 15 U.S.C. § 78j (emphasis added). That is the wrong place to look. While those provisions are similar to Section 6(c)(1) and Rule 180.1 in many respects—including the use of the phrase "in connection with"—they notably differ in the use of the "purchase or sale" language. There is no equivalent "purchase or sale" language in the portion of Section 6(c)(1) addressing swaps. 7 U.S.C. § 9(1); *see Prime Int'l Trading v. BP PLC*, 937 F.3d 94, 107 (2d Cir. 2019) ("There is nothing in Section [9(1)'s] text suggesting it focused on 'purchases and sales of securities in the United States . . . .").

The textual difference is critical. Case law from the securities context may be useful for interpreting the phrase "in connection with," but the relevant question here is: In connection with what? Under the CEA, the issue is whether the fraud is in connection with any swap, not in connection with the purchase or sale of a swap. So long as the scheme is "material to" the parties to the swap—whether it be their decision to purchase, sell, exercise, or terminate—the scheme is in connection with the swap. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014).

Phillips is wrong to claim that *CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018),

counsels a different result. Mot. at 11. That decision involved a CEA claim related to fraud "in connection with contracts of sale of a commodity," so the court focused on whether the fraud was in connection with the contract of sale. *McDonnell*, 332 F. Supp. 3d at 722-23. The CEA's focus is different with respect to swaps because, as explained above, those are fundamentally different financial products. This Court should follow the plain text of the statute.

Finally, Phillips is wrong to claim that the CEA does not apply to his crime because the OT Option is, in his telling, a "foreign swap." Mot. at 8-9. Factually, calling the OT Option a "foreign swap" is incorrect: Glen Point was registered with the CFTC, its counterparty (and victim of Phillips's fraud) was American Bank-1, and the prime broker it used to create the OT Option was American Bank-2. Indictment ¶ 13. Evidence at trial will also show, among other things, that Glen Point itself was based, in part, in the United States; that part of the OT Option was assigned to Client Fund-1, which is run from the United States; that one of the Glen Point funds that benefited from the OT Option was based in the United States; and that the swap was recorded with an American swap reporting service. Phillips's claim that the OT Option is a "foreign swap" is just a spin on the facts, which is not a basis for a motion to dismiss.

Legally, Phillips's claim that the OT Option is a "foreign swap" is based on a clear misinterpretation of the CEA. The statute does not divide the world into foreign swaps and domestic swaps; it just defines "swaps" based on the nature of the financial product. *See supra* at 11. There is no question that the OT Option is a "swap" under that definition, so Phillips cannot seek dismissal by inventing a new category of "foreign swaps." The legal authority Phillips cites is not about foreign and domestic swaps, but about the extent to which certain provisions of the CEA "apply to *activities* outside the United States." 7 U.S.C. § 2(i)(1) (emphasis added). That is, the extent to which certain conduct-regulating provisions of the CEA, including Section 6(c)(1)

and Rule 180.1, apply extraterritorially. As explained in the next section, the Indictment charges a domestic application of Section 9(1) and Rule 180.1, or at a minimum a permissibly extraterritorial application of those provisions. There is not a separate requirement that the swap be domestic. That is simply not a part of the CEA's statutory scheme.

### C. The CEA Counts Do Not Allege an Impermissibly Extraterritorial Application of the CEA

Despite the fact that Phillips manipulated a dollar-denominated exchange rate, to deceive an American counterparty into paying $20 million, Phillips argues that the CEA Counts charge an impermissibly extraterritorial application of the statute. Mot. at 8-9, 12-15. This argument is wrong on the merits and is not a proper basis for a motion to dismiss.

Procedurally, Phillips's extraterritoriality argument must wait for full factual development at trial. Phillips's brief proceeds from the premise that whether the CEA Counts are impermissibly extraterritorial is a "jurisdiction[al] question." Mot. at 9. But the Supreme Court in *Morrison v. National Australia Bank*, held that extraterritoriality is a "merits question," not a question of "subject-matter jurisdiction" that implicates a court's "power to hear a case." 561 U.S. 247, 254 (2010). The Second Circuit has applied that logic in the criminal context, holding that whether an Indictment alleges an impermissibly extraterritorial application of a statute "is a merits question." *United States v. Prado*, 933 F.3d 121, 138 (2d Cir. 2019).

Because extraterritoriality is a merits question, it is not a basis for dismissing an Indictment, particularly where, as here, the extraterritoriality issue requires a full presentation of evidence. *See Perez*, 575 F.3d at 166 (holding that weighing evidence underlying indictment not allowed unless the Government has made "a full proffer of the evidence it intends to present at trial"). The Second Circuit and courts in this district routinely evaluate extraterritoriality arguments based on the full record developed at trial. *See, e.g.*, *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020)

(finding Government "presented ample evidence" at trial to show charge was not extraterritorial); *United States v. Vilar*, 7298 F.3d 62, 77 (2d Cir. 2013) (finding trial record contained sufficient evidence that charge was not extraterritorial); *United States v. Epksamp*, 832 F.3d 154, 169 (2d Cir. (2016) (same). This is akin to the rule that proof of jurisdictional elements—like proof of an effect on interstate commerce—is evaluated only upon a full presentation of the evidence. *See United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Phillips has not identified a single case in this District where a court has dismissed an indictment at the motion to dismiss stage on extraterritoriality grounds. And dismissal at this stage would be inconsistent with the legal rules governing indictments. The point of an indictment is to "inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in future prosecution." *Id.* at 776. A full exposition on extraterritoriality is not necessary to accomplish either of those purposes. Accordingly, given the fact-intensive nature of the extraterritoriality issue, resolving the matter at this stage would be inappropriate.

In any event, even if this Court reached the merits, the CEA Counts would easily pass muster. When it comes to swaps, the CEA applies both domestically and extraterritorially. The CEA Counts are a domestic application of the statute, but even if they were not, their extraterritorial reach would be permissible under the statute.

> ### 1. Section 6(c)(1) and Rule 180.1 Have Both Domestic and Extraterritorial Reach as Applied to Swaps

With respect to swap-related activity, the CEA reaches not only domestic conduct, but also extraterritorial conduct. The CEA, like other statutes, is interpreted "in light of the presumption against extraterritoriality." *Prime Int'l Trad. v. BP PLC*, 937 F.3d 94, 102 (2d Cir. 2019). This requires applying a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090, 2101 (2016). First, "courts look to the text of the statute

to discern whether there is a clear indication of extraterritoriality." *Prime*, 937 F.3d at 102. If the statute lacks such a clear statement, it "does not apply abroad." *Id.* "[A]t the second step," then, courts must determine whether the case involves a proper "domestic application of the statute" by "evaluat[ing] whether the domestic activity pleaded is the focus of congressional concern." *Id.*

Generally speaking, Section 6(c)(1) and Rule 180.1 do not apply extraterritorially because they "lack[] . . . a clear statement of extraterritorial effect." *Id.* at 103. The question, then, is whether a particular charge under those provisions is not "so predominantly foreign as to render the claims impermissibly extraterritorial." *Id.* at 107; *accord In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 267 (2d Cir. 2023). In answering that question, courts look to whether the case involves domestic activity related to the "focus" of Section 6(c)(1) and Rule 180.1, which is "rooting out manipulation and ensuring market integrity." *Prime*, 937 F.3d at 107.

But while Section 6(c)(1) and Rule 180.1 *generally* do not apply extraterritorially, there is a statutory exception for conduct related to swap, including the conduct alleged in the CEA Counts. Under 7 U.S.C. § 2(i), the provisions of the CEA "relating to swaps" apply "to activities outside of the United States" if those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States." This provision, which was enacted in light of "the interconnected nature of domestic and international swaps trading," provides "for the extraterritorial application" of CEA provisions related to swaps, including Section 6(c)(1). *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 388 (D.D.C. 2014). The Second Circuit has held that this provision "contains, on its face, a clear statement of extraterritorial application," *Prime*, 937 F.3d at 103, so applications of Section 6(c)(1) and Rule 180.1 related to swaps can reach extraterritorial activities, so long as those activities are of a class that have a "direct and significant connection with activities in, or effect on, commerce of the United States," 7 U.S.C. § 2(i).

It follows, then, that the CEA Counts are not impermissibly extraterritorial if they are either a domestic application of the law or within the statute's extraterritorial reach under Section 2(i).

### 2. The CEA Counts Are a Domestic Application of the Statute

The CEA Counts charge a domestic application of the statute. The focus of Section 9(1) and Rule 180.1 is to "root[] out manipulation and ensur[e] market integrity." *Prime*, 937 F.3d at 103. As alleged in the Indictment, Phillips's scheme was inextricably tied to the United States from beginning to end, so it is not "so predominantly foreign as to render" the CEA claims an extraterritorial application of the statute. *Platinum*, 61 F.4th at 267.

From its creation, the OT Option was a domestic concern. As alleged in the Indictment, Glen Point, which was registered with the CFTC, held one side of the option, standing to benefit if the USD/ZAR exchange rate fell below 12.50. Indictment ¶ 10. American Bank-1, a financial institution in the United States, held on the other side, on the hook to make the payment if Glen Point's bet paid off. *Id.* ¶ 11. Glen Point also used another American financial institution, American Bank-2, as its prime broker for the transaction, which meant that Glen Point's contract for the OT Option had American Bank-2 as the counterparty. *Id.* ¶ 13. As a result, two financial institutions in the United States had direct interests in the OT Option.[3]

Phillips's illegal scheme to trigger the OT Option also involved conduct in, and directed at, the United States. For one, a critical component of Phillips's scheme was selling huge quantities of dollars to shift the USD/ZAR exchange rate. *Id.* ¶ 18. While Phillips was in South Africa at

---

[3] Phillips notes that Glen Point interacted with the London branch of American Bank-2. Mot. at 13. That is of no moment. American Bank-2 is based in the United States, and CFTC regulations explicitly treat foreign branches of American financial institutions as "U.S. Persons" for purposes of the agency's regulations. *See* 78 Fed. Reg. at 45,315 ("[A] foreign branch of a U.S. person is itself a U.S. person."). The proof at trial will also establish that the financial risk associated with brokering the OTC Option was ultimately borne by the U.S. bank holding company, the shares of which are listed on the New York Stock Exchange.

the time and used a banker in Singapore to execute the sales, the conduct nonetheless directly affected a core American interest—the value of the dollar—and involved conduct in the United States because the trades Phillips ordered were settled in the United States, drawing on bank accounts held at the Federal Reserve Bank of New York. *Id.* ¶ 26.

Moreover, the point of the mass selling was to send a misleading price signal to the other parties involved in the OT Option, including American Bank-1 and American Bank-2. *See id.* ¶¶ 23-24. Those parties were watching to see if the USD/ZAR exchange rate would fall below 12.50, triggering the OT Option, and Phillips's trading sent the misleading signal that the rate had crossed that threshold due to the natural interplay of market forces. *Id.* To make sure the deception worked, Phillips had his employees confirm with, among others, American Bank-2 that the OT Option had been triggered, never disclosing the true reason the exchange rate fell below 12.50. *Id.* ¶ 24. And finally, Glen Point's funds and Client Fund-1 received their payout, which involved both American Bank-1 and American Bank-2 wiring money through the United States. *Id.* ¶ 25.

These allegations show that the CEA Counts stem from domestic activity that relates to the focus of the CEA, "rooting out manipulation and ensuring market integrity." *Prime*, 937 F.3d at 103. Phillips's scheme went to the heart of domestic market integrity because it involved undermining the reliability of a dollar-denominated exchange rate and manipulating a swap with an American counterparty and an American prime broker. The manipulation itself was also directed at, and involved activity in, the United States, including the settlement of Phillips's dollar sales, the misleading price signal his trading sent, the misleading statement he had an employee make to confirm the OT Option was triggered, and the receipt of his ill-gotten gains.

And that is just what is alleged in the Indictment. At trial, the evidence will show, among other things, that Client Fund-1, an American entity, was a party to the OT Option; that another

Glen Point fund that was a party to the swap had American investors; and that information about the OT Option, including its creation and triggering, was recorded with an American swap data repository, which exist to keep records on swaps regulated under the CEA. *See* CFTC, Data Repositories, *available at* https://www.cftc.gov/IndustryOversight/DataRepositories/index.htm.

Arguing against the domestic nature of this case, Phillips relies heavily on *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022). Mot. at 12-14. But that decision undermines Phillips's point. There, a private plaintiff sued under the CEA, arguing that the defendant's "conduct abroad" to manipulate "an index tied to a foreign market" had affected a position the plaintiff purchased on a "domestic market." *Id.* at 97. The Second Circuit rejected the claim *not* on the grounds that it was an impermissible extraterritorial application of Section 6(c)(1) and Rule 180.1, but instead because it was an impermissible extension of a separate provision that grants plaintiffs a private right of action under the CEA. *Id.* at 96-98. The Circuit allayed concerns that the decision would "undermine the ability of U.S. law and regulators to protect domestic markets and investors," by explaining that the decision "concerns private rights of action" and "has nothing to do with government enforcement." *Id.* at 98 n.11.

The case against Phillips, by contrast, goes to the core of the ability of American law and regulators to protect American markets and investors. The case involves not only a victim in the United States, but also manipulation of the dollar, misleading price signals and statements to American banks, and settlement and payment through the American financial institutions. The CEA was designed to allow the Government to protect these core American concerns.

These deep ties to the United States also distinguish this case from *Prime International*. There, the Second Circuit affirmed dismissal of a private CEA suit on the grounds that "[n]early every link in [the] chain of wrongdoing [was] entirely foreign": the defendants were foreign

entities, manipulating a foreign benchmark, through foreign transactions.  937 F.3d at 98, 100, 107; *see Platinum*, 61 F.4th at 267-68 (describing *Prime International*).  Phillips's scheme was altogether different.  Rather than being "entirely foreign," *Platinum*, 61 F.4th at 268, it was designed at each step to affect American interests and parties.   The scheme was inextricably tied to the United States, so the CEA Counts are a domestic application of the statute.

### 3.  In the Alternative, the CEA Counts Are a Permissible Extraterritorial Application of the Statute

In the alternative, the CEA Counts are a permissible extraterritorial application of the statute.  Phillips's scheme had a "direct and significant connection with activities in, or effect on, commerce in the United States," 7 U.S.C. § 2(i), so it falls within the CEA's extraterritorial reach.

Section 2(i) extends the CEA abroad to swap-related activities that have (1) a direct and significant connection with activities in commerce in the United States, or (2) a direct and significant effect on commerce in the United States.  7 U.S.C. § 2(i).  The CEA Counts charge a permissible extraterritorial application of Section 6(c)(1) and Rule 180.1 under both theories.

There is no question that Phillips's scheme had a "direct" connection with activities in, and effect on, commerce in the United States.  The CFTC has consistently explained that the term "direct" in Section 2(i) simply requires a "reasonably proximate causal nexus" between the swap activities and commerce in the United States.  78 Fed. Reg 45,292, 45,300 (2013); 85 Fed. Reg. 56,924, 56,929 (2020); *accord SIFMA*, 67 F. Supp. 3d at 392.  This is in line with Second Circuit case law interpreting the word "direct" in the context of a similar statute extending antitrust rules abroad.  *See Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395, 410 (2d Cir. 2014) (defining "direct" as requiring a "reasonably proximate causal nexus").

Each step of Phillips's scheme had a direct connection with, and effect on, commerce within the country.  Most glaringly, the crime had an American victim; the point of the scheme

was to trigger the OT Option, forcing American Bank-1 to pay $20 million. Indictment ¶ 11. A key part of accomplishing that scheme involved a massive sale of dollars for rand. That, too, was connected with activities in, and had an effect on, commerce in the United States: the sales were settled through a bank in the United States and affected the integrity of a dollar-denominated exchange rate. *Id.* ¶¶ 18, 26. Another component of Phillips's scheme was sending a misleading price signal and misleading confirmation to, among others, American Bank-2, which was Glen Point's prime broker and the counterparty to the OT Option. *Id.* ¶¶ 13, 24. Because Bank-2 is headquartered in New York, and the risks associated with brokering the OT Option were ultimately borne by the US parent, a NYSE listed firm, this conduct also had direct connection with, and effect on, commerce in the United States. Finally, Phillips's scheme triggered payments from American Bank-1 and American Bank-2, which came from American financial institutions and passed through New York. *Id.* ¶ 25.[4]

The scheme's connection with, and effect on, commerce in the United States was also "significant" under any plausible interpretation of the term. The CEA reaches "activities" abroad that have a "significant" connection with or effect on commerce in the country. 7 U.S.C. § 2(i). CFTC guidance has consistently interpreted this language as extending the CEA extraterritorially to categories of swap activities that have a significant affect "as a class or in the aggregate," rather than extending the statue extraterritorially using a "transaction-by-transaction" based approach. 78 Fed. Reg. at 45,300; *accord* 85 Fed Reg. at 56,930. This interpretation is in line with the many federal statutes that regulate activities that, as a class, affect interstate commerce. 78 Fed. Reg. at 45,300; *see, e.g.*, *Perez v. United States*, 402 U.S. 146, 154 (1971) ("Where the class of activities

---

[4] As explained above, the Government expects the evidence at trial will show additional connections between Phillips's scheme and the United States. *See supra* at 19-20.

is regulated and that class is within the reach of federal power, the course have no power to excise, as trivial, individual instances of the class."); *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997) (explaining that, because the Hobbs Act and money laundering statutes "regulate activities which, in the aggregate, have a substantial effect on interstate commerce" then "the *de minimis* character of individual instances arising under [the] statute is of no consequence").

Under this interpretation of Section 2(i), the CFTC has held that swap activities involving "U.S. persons" satisfy Section 2(i)'s "direct and "significant" test. 78 Fed. Reg. at 45,308-09; 85 Fed. Reg. at 56,940; *SIFMA*, 67 F. Supp. 3d at 391. "U.S. persons" include companies that are located or incorporated in the United States or that have their principal place of business in the United States. 78 Fed. Reg. at 45,309. A foreign branch of a U.S. person—such as the foreign branch of a bank based in the United States—is also a U.S. person. *Id.* at 45,315. When an entity engages in "swap activities involving" a "U.S. person," those activities "satisfy the 'direct and significant test under [S]ection 2(i)." *Id.* at 45,309; *see* 85 Fed. Reg. at 56,940.

Applied here, Phillips's manipulative and deceptive scheme was of a class of activities that have a significant connection with, and effect on, commerce in the United States. For one, the scheme involved numerous U.S. persons and therefore satisfied the "direct and significant" test. The victim of the scheme, American Bank-1, was a U.S. person. So was American Bank-2, Glen Point's prime broker for the OT Option. And the Government expects evidence at trial will show that multiple beneficiaries of the OT Option, including Client Fund-1, were U.S. persons. Under the CFTC's guidance, then, the charged scheme falls comfortably within Section 2(i).

Moreover, Phillips's illegal scheme is clearly part of a class of activities that, in the aggregate, have a significant connection with, and effect on, commerce in the United States. The CFTC has emphasized that the CEA's "anti-manipulation provisions" protect "market integrity,"

and that it is "essential that they apply" even when the swap involves a party that is not a U.S. person. 78 Fed. Reg. at 45,337. Indeed, the CFTC has regulated against the presumption that "persons engaging in any aspect of swap transactions within the U.S." are "subject to the CEA and commission regulations prohibiting the employment, or attempted employment, of manipulative, fraudulent, or deceptive devices." 85 Fed. Reg. at 56,961, 56968. Finding that Phillips's scheme was not subject to Section 2(i) would erode the CEA's ability to protect American investors and American markets from fraud and manipulation.

Finally, even if this Court adopted a transaction-based approach to interpreting the term "significant," Phillips's scheme easily qualifies as having both a sufficient connection with, and effect on, commerce in the United States. Phillips moved a dollar-denominated exchange rate and misled multiple American financial institutions, to obtain $20 million from an American victim. Both the scheme and the payout were significant by any reasonable understanding of the term. *See* Merriam Webster *available at* https://www.merriam-webster.com/dictionary/significant (defining "significant' as "a noticeably or measurably large amount").

Phillips's only argument to the contrary is based on an obvious misreading of CFTC guidance. Phillips cites a passage of that guidance stating that one of the primary reasons for the enactment of the Dodd Frank reforms in the CEA was to guard against "systemic risk" to the United States financial system. Mot. at 8-9. That is true, but it does not follow that Section 2(i) applies only when the specific swap at issue in a case "posed 'systemic risks.'" *Id.* at 9. It is hard to imagine any single transaction that would meet that standard. Nor would it make sense for Congress to have regulated only single transactions that pose systemic risks, while leaving unregulated entire classes of activity that, as a whole could pose a substantial threat to the economy. *See* 78 Fed. Reg. at 45,294 (explaining how poor risk management over time

contributed to the 2008 financial crisis).  That is why, in the guidance document Phillips cites, the CFTC rejects the "transaction-by-transaction" approach to interpreting Section 2(i) that Phillips now proposes.  *Id.* at 45,300.  This Court, too, should reject his cramped reading of the statute.

**D.     The CEA Counts Allege Violations of Section 6(c)(1) and Rule 180.1**

In his final challenge to the CEA Counts, Phillips argues that the Indictment does not to allege "a scheme to defraud based on manipulative trading."  Mot. at 15.  This argument falters from the get go because Phillips does not contend the Indictment fails to include "the elements of the offense charged," "fairly inform[] [him] of the charges," or "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  That is all that is required at this stage of the case.

Instead, Phillips makes what amounts to a motion for summary judgment, asserting that the Government will need to prove certain elements at trial, such as the creation of an "artificial price"; claiming that the "trading described in the Indictment could not have caused an artificial price" because, as Phillips sees it, there was no "deceptive conduct"; and arguing that Phillips lacked the necessary intent to manipulate the market.  Mot. at 15-19.  None of these arguments are appropriately resolved on a motion to dismiss.  *See United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) ("[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence on a motion for summary judgment, a judge generally cannot do the same for a federal criminal indictment.").  In any event, Phillips is far off the mark on the merits, relying on case law applying the wrong statute, ignoring years of Second Circuit decisions regarding open-market manipulation, and misconstruing the allegations in the Indictment.

**1.     *The CEA Counts Allege a Violation of Section 6(c)(1) and Rule 180.1***

Phillips engaged in a deceptive scheme to trigger the OT Option by driving the USD/ZAR exchange rate below 12.50, then failing to disclose to the relevant counterparties that the OT

Option had been triggered by his own, manipulative trading activity. *See* Indictment ¶¶ 30-34. This deceptive conduct amounts to a clear violation of Section 6(c)(1) and Rule 180.1.

Section 6(c)(1) prohibits using "any manipulative or deceptive device" in connection with a swap. 7 U.S.C. § 9(1). That "manipulative or deceptive" language "is virtually identical to the terms used in [S]ection 10(b) of the Securities Exchange Act of 1934." 76 Fed. Reg. 41,398, 41,399 (2011). Given the similarity, the CFTC "model[ed] . . . Rule 180.1 on SEC Rule 10b-5." *Id.* In so doing, the CFTC stated that it would "be guided," although "not controlled, by the substantial body of judicial precedent applying the comparable language of . . . Rule 10b-5." *Id.*

For decades, courts in this Circuit have recognized, in the context of securities cases, that the ban on "manipulative or deceptive" devices "prohibits not only material misstatements but also manipulative acts," including market manipulation. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Market manipulation is a form of deception that involves "intentional or willful conduct designed to deceive or defraud [other market participants] by controlling or artificially affecting" prices. *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007); *accord Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021).

While market manipulation "encompasse[s] practices such as wash sales, matched orders, or rigged prices, [it] is not limited to these practices." *SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017). Rather, manipulation "broadly includes those practices that are intended to mislead investors by artificially affecting market activity." *Id.*; *see SEC v. Vali Mgmt.*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. 2022) (summary order) ("In using the term 'manipulation,' there is no doubt that Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). Ultimately, "[t]he gravamen of manipulation is deception of investors into believing" that prices "are determined by the natural interplay of supply and

demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

Thus, to sustain a charge of market manipulation under SEC Rule 10b-5 and Section 10(b) of the Exchange Act, under which Rule 10b-5 was promulgated, "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI Commc'ns*, 493 F.3d at 100. "The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.*; *see also Set Capital*, 996 F.3d at 76 ("For market activity to artificially affect a security's price, we generally ask whether the transaction or series of transactions sends a false pricing signal to the market."); *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (approving criminal jury instruction that "[t]he essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand"); *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (holding, in criminal case, that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact").

The principle that deception encompasses misleading others to believe that prices are determined by the natural forces of supply and demand, not rigged by manipulators, applies with equal force to the CEA. Section 6(c)(1) of the CEA contains the same "manipulative or deceptive device" phrase from which this principle arises. *See Morisette v. United States*, 342 U.S. 246, 263 (1952) (explaining that when Congress uses specific terms of art or legal phrasing, there is a presumption that it "knows and adopts the cluster of ideas that were attached to each borrowed word"). And courts applying Section 6(c)(1) and Rule 180.1 in cases involving manipulation have

drawn from this Circuit's securities case law. *See, e.g.*, *CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015) (holding that Section 9(1) claim "should be interpreted in line with Section 10(b)); *Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037, 1054 (N.D. Ill. 2016) (same).

Applied here, the Section 10(b) case law provides a clear guide. Phillips is accused deception in connection with the OT Option. His deception arises, in part, from the fact that he misled other relevant parties to the security to believe the exchange rate fell below that threshold due to the natural interplay of supply and demand, rather than his own effort to trigger the option. To be sure, this is, in some respects, different than many Section 10(b) cases: Phillips's scheme was to deceive the parties to the OT Option, not investors generally. But the basic principle is the same: it is misleading to trick others into believing that a particular price—here, the exchange rate—arose through the natural interplay of supply and demand, when it in fact came about through the efforts of the manipulator.

### 2.      Phillips Wrongly Relies on Elements From a Different Statute

Phillips's argument starts with the false premise that the Government "must prove the four necessary elements" of what Phillips calls "non-fraud-based manipulation." Mot. at 15. The elements that Phillips is referring to are from a *different statute*—commonly referred to as Section 9(a)(2) of the CEA ("Section 9(a)(2))—which predates Section 6(c)(1) and prohibits "manipulat[ing] . . . the price of any . . . swap." 7 U.S.C. § 13(a)(2). Establishing liability under Section 9(a)(2) requires proof that: "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Comm. Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008). Legally and logically, these elements do not apply to claims under Section 6(c)(1) and Rule 180.1.

Legally, the statutory language and regulatory guidance show that the elements of

Section 9(a)(2) do not apply in anti-manipulation actions under Section 6(c)(1). As explained above, the operative language of Section 6(c)(1) prohibits "manipulative or deceptive" devices, and neither the text of the statute nor of Rule 180.1 suggest that proof of such a scheme requires establishing any elements from Section 9(a)(2). On top of that, the language in Section 6(c)(1) is almost a verbatim recitation of language in Section 10(b) of the Securities Exchange Act. This is powerful evidence that Congress intended the elements of Section 10(b) of the Exchange Act, and the case law interpreting it, to serve as a guide for applying Section 6(c)(1). *See FAA v. Cooper*, 566 U.S. 284, 292 (2011) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."). And as explained above, and discussed further below, nothing in the case law applying Section 10(b) of the Exchange Act requires proof akin to the elements of Section 9(a)(2) of the Commodities Exchange Act. Rather, the case law applying Section 10(b) of the Exchange Act holds that a deceptive scheme can be established through proof of open-market transactions conducted with an intent to manipulate the forces of supply and demand. *See supra* at 25-28; *see also infra* at 31-33.

By contrast, Congress used language from Section 9(a)(2) in a *different* part of Section 6(c)—specifically, Section 6(c)(3), which contains much of the same language as Section 9(a)(2). This shows that, if Congress wanted to import the law from Section 9(a)(2) into Section 6(c)(1), it knew how to do so. Congress did not put Section 9(a)(2)'s language into Section 6(c)(1), so there is no basis to judicially graft the two statutes together. Indeed, consistent with the statutory language, CFTC's rulemaking that created Rule 180.1 specified that the Section 6(1) was intended to "*augment* the Commission's existing authority to prohibit fraud and manipulation," not to replicate what was already covered by Section 9(a)(2). 76 Fed. Reg. at 41,401 (emphasis added);

*see Kraft*, 153 F. Supp. 3d at 1010 (rejecting argument that case law from Section 9(a)(2) applies to claims under Section 6(c)(1)).

Logically, it makes little sense to import elements from section 9(a)(2) to Section 6(c)(1). The statutes serve different functions. Section 9(a)(2) is about manipulating prices, whereas Section 6(c)(1) broadly prohibits deception in connection with swaps and other products. *See Kraft*, 153 F. Supp. 3d at 1018 (explaining the different functions of Section 9(a)(2) and Section 6(c)(1)).[5] This is why the elements of Section 9(a)(2) claims do not readily map onto Section 6(c)(1) claims. The first three elements of Section 9(a)(2) claims, for instance, require that the defendant had the ability to influence prices, that an artificial price existed, and that the defendant caused the artificial price. These elements all go to the *success* of a manipulative scheme. But they have no home in Section 6(c)(1), which like Section 10(b), imposes a form of scheme liability: prohibiting all manipulative or deceptive devices, without regard to the success of those schemes. *See, e.g.*, *Vali Mgmt.*, 2022 WL 2155094, at *2 (holding that, under Section 10(b), there is no "require[ment]" of showing artificial market impact . . . before concluding certain acts are manipulative"); *Koch v. SEC*, 793 F.3d 147, 153-54 (D.C. Cir. 2014) (rejecting argument that proof of price impact is necessary because "intent—not success—is all that must accompany manipulative conduct to prove a violation of [Section 10(b)]").

Similarly, Section 9(a)(2)'s requirement of an intent to create an artificial price does not translate to Section 6(c)(1). As noted above, the former prohibits "manipulat[ing] . . . price," whereas the latter is not so restricted. *See* 76 Fed. Reg. at 41,398 (Rule 180.1 applies "regardless

---

[5] As noted in *Kraft*, Section 9(a)(2) is, in some respects, broader than Section 6(c)(1) in that it unambiguously applies to manipulation even when the manipulator has fully disclosed the manipulation to the intended victim (such as a hypothetical situation where Phillips told other parties to the OT Option in advance that he was going to move the exchange rate to trigger the barrier option). *See Kraft*, 153 F. Supp. 3d at 1018.

of whether the conduct in question was intended to create or did create an artificial price"). Accordingly, the abstract concept of "artificial price" makes little sense in most Section 6(c)(1) cases; rather, the appropriate inquiry is whether the defendant is acting with the intent to deceive, including the intent to deceive by interfering with the natural forces of supply and demand.

The case at hand is a perfect example: Phillips is charged not with manipulating prices generally, but rather with manipulating the USD/ZAR exchange rate to momentarily pass the 12.50 threshold required to trigger the OT Option. What makes his conduct deceptive is the fact that it was designed to deceive counterparties to the OT Option into believing the exchange rate fell below 12.50 due to the natural interplay of supply and demand, rather than his own manipulative conduct. Abstract notions of an "artificial price" have no bearing on that analysis.[6]

### 3. The CEA Counts Do Not Require Deceptive Conduct Beyond Open Market Transactions with Manipulative Intent

In addition to relying on elements from the wrong statute, Phillips also disregards clear Circuit precedent, claiming that "open market" transactions cannot be manipulative without additional "deceptive conduct." Mot. at 16-17. This misconstrues the meaning of deception in the context of market manipulation and the Second Circuit has rejected the argument that deceptive conduct beyond the intent to alter natural interplay of supply and demand is required.

As explained above, market manipulation can be deceptive by misleading other market participants to believe prices are set "by the natural interplay of supply and demand," not the

---

[6] These facts distinguish this case from *CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022), which did not involve a manipulative scheme to trigger an option. The Government respectfully submits that, for the reasons described in this section, *Gorman* was wrong to import elements from Section 13(a)(2) to a Section 9(1) claim. *See Kraft*, 153 F. Supp. 3d at 1010-11 (rejecting that approach). But this Court need not resolve the interaction between Section 13(a)(2) and Section 9(1) generally, because importing elements from one to the other is inappropriate in this case.

conduct of the manipulator. *ATSI Commc'ns*, 493 F.3d at 100. Deceptive market manipulation can involve deceptive conduct, like affirmative misstatements or wash trading, but that is not required. *See LEK Secs.*, 276 F. Supp. 3d at 59.

The Second Circuit and courts in this District have repeatedly held that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital*, 996 F.3d at 77; *see, e.g.*, *Masri*, 523 F. Supp. 2d at 361 ("[I]f an investor conducts an open-market transaction with the intent of artificially affecting the price of the security . . . it can constitute market manipulation."); *LEK Secs.*, 276 F. Supp. 3d at 59 ("Market manipulation can be accomplished through otherwise legal means."); *see also Gorman*, 587 F. Supp. 3d at 42-43 (holding, in Section 9(1) context, that "open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity . . . when coupled with manipulative intent"); *CFTC v. Amaranth*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (holding, Section 13(a)(2) context, that "manipulative intent alone can support liability for otherwise legal, open-market transactions"). In fact, just last year, the Second Circuit affirmed a jury instruction explaining that, "[i]n some cases, a defendant's 'scienter,' that is, a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading." *Vali Mgmt.*, 2022 WL 2155094, at *1.[7]

None of the decisions Phillips cites establish that open-market trading, coupled with manipulative intent, is insufficient to prove manipulation. Phillips, for instance, cites a passage

---

[7] Phillips is wrong to claim that defendants in this Circuit have not been convicted of market manipulation based on open-market trades without "other deceptive conduct." *See, e.g.*, *Regan*, 937 F.2d at 829 (upholding conviction based on short selling to depress price); *Royer*, 549 F.3d at 900 (rejecting argument that instruction was erroneous because it allowed conviction based solely on open-market trading). Courts in this District have also recently denied motions to dismiss based on the premise that deceptive conduct is required to prove market manipulation. *See United States v. Hwang*, No. 22 Cr. 240 (ALK), Dkt. No. 66 at 3 (S.D.N.Y. Mar. 23, 2023)

from *ATSI* stating that "short selling . . . is not, by itself, manipulative," and that it must be combined "with something more" to constitute manipulation. 493 F.3d at 101. But *ATSI* recognized that the "something more" could be the defendant's intent, noting that, "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.* at 102; *see Set Capital*, 996 F.3d at 77 (adopting this interpretation of *ATSI*).

Phillips is also wrong to rely on *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), to claim that the Circuit has "misgivings" about open-market manipulation claims. Mot at 17-19. Unlike in this case, the Government's theory in *Mulhern* was not that market manipulation is a way to deceive investors into believing that the price is set by natural market forces, and the Circuit "express[ed] no view" on that "alternative" approach. 938 F.2d at 368 & n.2. Moreover, whatever "misgivings" the Second Circuit might have had when *Mulheren* was decided in 1991, decades of case law since have come down firmly on the side of concluding that open-market transactions can be illegal, when paired with manipulative intent. *See supra* at 25-28, 31-32.

Finally, Phillips's attempt to read *CFTC v. Wilson*, No. 13 Cv.7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), for the proposition that manipulative intent does not render open-market trading illegal, Mot. at 19, is misguided. For one, that case involved Section 9(a)(2), not Section 6(c)(1), and so involved a different set of legal questions than in this case. And even setting that aside, the Court in *Wilson* simply found, after trial, that the defendant lacked manipulative intent—in other words, that he did not have the intent to create prices that were "unreflective of the forces of supply and demand." 2018 WL 6322024, at *15.

In short, the case law is clear: the fact that part of Phillips's crime involved selling dollars for rand on an open market does not mean it was not a manipulative and deceptive scheme punishable under Section 6(c)(1) and Rule 180.1.

#### 4. The CEA Counts Allege Manipulative Intent and Deceptive Conduct

Finally, Phillips claims that his mass sales of dollars for rand had a "legitimate economic rationale." Mot. at 18-19. That assertion is at odds with the Indictment, which alleges that Philips "intentionally and artificially dr[ove] the USD/ZAR exchange rate below the threshold level set by the [OT Option] in order to trigger [a] $20 million payment and defraud the counterparties to the options contract." Indictment ¶ 2; *see also id.* ¶ 20 (alleging that Phillips "expressly stated that [his] purpose in directing these USD/ZAR spot trades was to drive the USD/ZAR rate below 12.50"). At this stage, the Court must accept "the facts alleged by the government . . . as true," *Velastegui*, 199 F.3d and 592 n.2, and it is not proper to weigh the sufficiency of the evidence, *Perez*, 575 F.3d at 166, so the Court should reject Phillips's efforts to litigate his intent.

Moreover, even if it were proper to evaluate the factual allegations in the Indictment, and even if Phillips were correct that, to prove the CEA Counts, the Government needed to prove an artificial price and deceptive conduct, the motion to dismiss would still fail. The Indictment repeatedly alleges that Phillips's scheme was "to intentionally and artificially manipulate the USD/ZAR exchange rate to drive the rate below 12.50 and trigger payment under the [OT Option]." Indictment ¶ 17. The Indictment also alleges facts that Phillips's trading and triggering of the OT Option occurred in a deceptive manner. Phillips made massive sales of dollars for rand over a short period of time. *Id.*; *see Set Capital*, 996 F.3d at 77 (finding "flood[ing] the market" is deceptive); *ATSI*, 493 F.3d at 101 (finding "trading engineered to stimulate demand" can be deceptive). He made those sales late at night on a holiday, at a time when he was the "only seller[] in the market." *Id.* ¶¶ 19-20; *see Set Capital*, 996 F.3d at 77 (finding taking advantage of "illiquidity in the . . . market" was deceptive); *Royer*, 549 F.3d at 900 (finding timing trading to maximize impact on price was deceptive). And he did not disclose to the other relevant parties to the OT Option that his own trading activity, carried out with intent to drive the exchange rate below

12.50, is what triggered the option. *Id.* ¶¶ 23-24; *see Regan*, 937 F.2d at 829 (finding "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit . . . .").

In short, even if there were a requirement, which there is not, that the Indictment contain factual allegations demonstrating an artificial a price and deceptive conduct, the obligation would be more than satisfied by what is contained in the Indictment.

## II.    The Motion to Dismiss the Wire Fraud Counts Should be Denied

Phillips's challenge to the Wire Fraud Counts stumbles out of the gate because it relies on arguments that are not properly resolved on a motion to dismiss.   Phillips does not contend that the Indictment fails to state the "elements of the offense[s]" or put him on notice of charges, nor does he claim that the Indictment is insufficient to allow him to "plead an acquittal or conviction in bar of future prosecution." *Wedd*, 993 F.3d at 120.  Instead, he claims that "[t]he alleged omission was not misleading" or "material."  Mot. at 23-24.  These are arguments about the "adequacy of the facts," so his motion should be denied out of hand. *Dawkins*, 999 F.3d at 780.

Even looking past that fatal flaw, Phillips's arguments fail on the merits.  The wire fraud statute "penalize[s] using . . . a wire communication to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016).  A scheme to defraud does not require an affirmative falsehood or an omission in the context of a fiduciary duty.  "[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).  In this sense, "[a] duty to disclose can . . . arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure to avoid being misleading." *Id.*; *see* Rest. (Second) of Torts § 529 (1977) (a "representation stating the truth so far as it goes" may be misleading because of the "failure to state additional or

qualifying matter[s]").

Here, Phillips's fraudulent scheme involved having Glen Point employees tell other parties to the OT Option that the 12.50 barrier had been reached, without disclosing that Phillips's manipulative trading drove the exchange rate below that threshold. As explained in the Indictment, Glen Point was the "Calculation Agent" in connection with the OT Option. Indictment ¶ 13. This meant that it was in charge of determining whether the 12.50 barrier had been reached. *Id.* The relevant contracts specified that, in making that determination, Glen Point would do so "in good faith and in a commercially reasonable manner." *Id.*

Right after driving the exchange rate below 12.50, Philips had Glen Point employees carry out this Calculation Agent role by telling other parties to the OT Option—including American Bank-2—that the barrier had been reached. *Id.* ¶ 23. While these statements may have been literally true, they were misleading because they omitted that Phillips had triggered the barrier through a manipulative trading strategy.

The deception arose in two respects. For one, because Glen Point was acting as Calculation Agent, the statement that the OT Option barrier had been triggered carried the implicit representation that Glen Point had made that determination in "good faith" and in a "commercially reasonable manner," such that Glen Point was entitled to payment. *Id.* ¶ 13. This was misleading because, in reality, Glen Point had not acted reasonably, but instead determined the triggering event based on its own manipulative trading. *See, e.g.*, *Univ. Health Servs. v. United States*, 579 U.S. 176, 188-90 (2016) (finding implied certification of entitlement to payment is fraud when coupled with omission of compliance with "contractual requirements"); *United States v. Harris*, 821 F.2d 589, 599 (5th Cir. 2016) (fining fraudulent statement based on "implied representation"); *United States v. Naiman*, 211 F.3d 40, 44 (2d Cir. 2000) (finding mail fraud where defendant billed

under contract without disclosing breach); *United States v. Frank*, 156 F.3d 332, 334-36 (2d Cir. 1998) (same). Separately, the representation that the OT Option had been triggered impliedly conveyed that the 12.50 barrier had been reached due to the natural interplay of supply and demand, rather than Glen Point's manipulative trading. *See Regan*, 937 F.2d at 829 ("Failure to disclose that market prices are being artificially depressed operates as a deceit . . . and is an omission of a material fact."); *ATSI*, 493 F.3d at 100 (finding "deception arises" when market participants are "misled to believe" prices "are determined by the natural interplay of supply and demand, not rigged by manipulators"). Thus, in order to make the statements not misleading, Phillips was required to disclose that the OT Option had been triggered due to his trading strategy.

None of Phillips's arguments undermine this theory, much less provide a basis to dismiss the Indictment. His lead argument—that Glen Point lacked a "fiduciary or other duty," Mot. at 21-22—is irrelevant. That is not the theory of fraud here and such a duty is not required. *Autuori*, 212 F.3d at 119 ("[A] fiduciary duty is not the *sine qua non* of fraudulent omissions").

The claims that the OT Option contracts "contemplated trading," and that Phillips did not even breach those contracts, Mot. at 22, are also distractions. It is true that Glen Point's OT Option contract with American Bank-2 discloses that American Bank-2 might engage in legitimate trading activities, such as hedging, that could affect the probability of the OT Option being triggered. But that is a point against Phillips, not in his favor. It shows that the mere possibility a party's legitimate trading could inadvertently affect the relevant exchange rate was important enough to disclose ahead of time. This is a clear indication that Phillips's illegitimate trading activity designed to move the exchange rate is something parties to the OT Option would have found important. By the same token, the claim that Phillips's manipulation "could not even [give rise to] a claim for breach of contract," Mot. at 22-23, is plainly wrong. Glen Point had an obligation

act in "good faith" and a "commercially reasonable manner," which it did not do when it manipulatively triggered the OT Option. This is, of course, a fraud case, not one for a breach of contract, so breach is not relevant. But the idea that Phillips complied with Glen Point's contractual obligation ignores at the clear language of the agreement.

Phillips next claims that that "[t]he alleged omission was not misleading," asserting that all Glen Point was supposed to do was report that the OT Option had been triggered. Mot. at 23-24. But this ignores that Glen Point was not only supposed to determine a barrier event, but to do so in good faith and a commercially reasonable manner. Indictment ¶ 13. As explained above, by reporting the event, without disclosing the manipulative trading that brough it about, Glen Point gave the false impression that it was acting appropriately under the contract, and that the barrier had been reached through natural market forces.

This situation is fundamentally different from the one in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Phillips relies. There, defendants were accused of submitting false information about the rate at which their bank could borrow money because, among other things, modifying submission to benefit certain trading positions. *Id.* at 825-29. The Second Circuit vacated the defendants' convictions, finding that the relevant submissions were false because the government failed to show they "were not rates at which [the bank] could" borrow money. *Id.* at 841-42. It also found the statements were not misleading because the statements did not imply anything about how the defendants determined the rates at which their banks could borrow money, beyond representing that the banks would not collude. *Id.* at 842-43. Here, by contrast, the OT Option contracts explicitly represent that Glen Point would determine the barrier event in good faith and in a commercially reasonable manner and statements about price (unlike statements about the rate at which banks can borrow money) carry an implicit representation that price is determined

by the natural forces of supply and demand, rather than by manipulators.

Finally, Phillips's materiality arguments do not even approach providing a basis for dismissal. Materiality is particularly "well suited for jury determination," *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015), and here, a reasonable jury could certainly conclude that Phillips concealing his market manipulation—which was both illegal and inconsistent with Glen Point's contractual obligations—was material.

Phillips's arguments to the contrary do not carry water. First, the OT Option contracts did not, as Phillips claims, say that parties might trade in ways that could affect the exchange rate, without having an obligation to disclose. Mot. at 25. Rather, it had an explicit, advance disclosure that American Bank-2 might need to engage in certain legitimate trading strategies that could inadvertently affect the exchange rate. If anything, this language suggests the importance of manipulative trading to the parties, since the contract included a disclosure specifically calling out legitimate trading that had an inadvertent rather than intentional impact on the exchange right.

Second, Phillips's claim that third parties could have served as the Calculation Agent is beside the point. Glen Point was the Calculation Agent, and it had an obligation to carry out that role in good faith and in a commercially reasonable manner. The fact the parties could have come up with a different arrangement did not give Glen Point a license to deceive his counterparty about his manipulative trading.

Finally, Phillips's argument that Glen Point did not make representations to American Bank-1 misunderstands the nature of the OT Option arrangements. Economically speaking, American Bank-1 held the opposite side of the OT Option. But contractually, Glen Point faced American Bank-2, its prime broker. The Indictment specifically alleges that American Bank-2 "required confirmation" from Glen Point that the OT Option had been triggered, and American

Bank-2 made the $20 million payment. Indictment ¶¶ 24-25. Thus, the misleading representation that the OT Option had been triggered was essential to Phillips's fraudulent scheme.

## III. **The Constitutional Challenge to the Indictment Should be Denied**

In his final argument, Phillips claims that all of the Counts are unconstitutionally novel and vague, in violation of the Fifth Amendment. This challenge is baseless. Phillips is charged with violating well-established legal rules prohibiting fraud and deception; rules that he clearly understood as a sophisticated trader registered with the CFTC. His effort to skirt responsibility is wrong on the merits and, at a minimum, not a basis for a motion to dismiss.

### A. **Applicable Law**

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*

"When a vagueness challenge alleges a lack of notice, the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of . . . what conduct is prohibited." *United States v. Houtar*, 980 F.3d 268, 274 (2d Cir. 2020). "This requirement assures that statutes do not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Id.* "Statutes need not, however, achieve meticulous specificity, which would come at the expense of flexibility and reasonable breadth." *Id.*; *accord United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity.").

### B. The Charges in the Indictment Do Not Violate the Due Process Clause

There is no merit to the argument that the charges in the Indictment are so novel or vague that they violate the Due Process Clause of the Constitution. This case involves a straightforward application of rules that have been in place for decades.

Phillips's first argument—that the Indictment charges a novel theory of manipulation—is just a repackaging of his challenge to the CEA Counts. This argument is no more correct when advanced under the guise of the Due Process Clause. The text of Section 6(c)(1) provides clear notice that it prohibits the full panoply of manipulative and deceptive schemes, broadly barring all "manipulative or deceptive device[s] or contrivance[s]." Rule 180.1 is similarly clear, and it was accompanied by CFTC guidance that it was intended to "reach all manipulative or deceptive conduct in connection with" the enumerated categories of transactions. 76 Fed. Reg. at 41,405. To be sure, neither the statute nor the regulation list all possible types of manipulative and deceptive devices, but that is not constitutionally required. *See Houtar*, 970 F.3d at 274 ("Statutes need not . . . achieve meticulous specificity . . . at the expense of flexibility and reasonable

breadth."). That is particularly important where, as here, the statute is intended to be flexible, so it can reach all types of manipulative and deceptive schemes. *See* 76 Fed. Reg. at 41,401 ("The [CFTC] intends to interpret and apply [Section 9(1) and Rule 180.1] not technically and restrictively, but flexibly to effectuate its remedial purpose.").

Moreover, going back years before Phillips's illegal scheme, courts had ruled that it open-market transactions with the intent to manipulate prices could be unlawfully deceptive. By the time of Phillips's crime in late 2017, Section 10(b) of the Securities Exchange Act—which uses the same "manipulative or deceptive" language as Section 9(1)—had been read to prohibit open-market manipulation for at least a decade. *See, e.g.*, *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) ("'[M]anipulation] can be illegal solely because of the actor's purpose."); *Masri*, 523 F. Supp. 2d at 371-72 ("[O]pen-market transaction with the intent of artificially affecting the price . . . can constitute market manipulation"); *ATSI*, 493 F.3d at 102 ("[I]n some cases scienter is the only factor that distinguishes legitimate trading form improper market manipulation"); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 82 (S.D.N.Y. 2015) (holding that "open-market transaction" may be manipulative "when coupled with manipulative intent"). Courts had also applied this rule to Section 6(c)(1) in the years before Phillips's illegal scheme. *See, e.g.*, *Kraft*, 153 F. Supp. 3d at 1010-11 (applying rule against open-market manipulation to Section 6(c)(1) in 2015); *Ploss*, 197 F.3d at 1054-56 (same in 2016). Given the text of the statute and years of case law, there is no basis to claim that people "had no reason to even suspect" that open-market manipulation "might be within [the statute's] scope." *Houtar*, 980 F.3d at 274.

That many of these decisions arise in the context of civil actions is of no moment. In this context, civil and criminal enforcement actions rely on the same statutes and regulations, so cases in the civil context show what those conduct statutes prohibit. And in any event, the Second Circuit

has, on multiple occasions, held that defendants can be criminally convicted of manipulation based on open-market transactions with an intent to manipulate. *See supra* at 32 n.7. At bottom, this is not a case involving novel legal principles or thorny questions about how much Phillips was allowed to trade and when. Mot. at 27-28. Rather, it is a straightforward application of the established principle that trading with intent to manipulate can be unlawfully deceptive.

Phillips is also wrong to challenge the constitutionality of prosecuting him based on fraudulent representations in connection with triggering the OT Option. Mot. at 28-29. As explained above, the Government does not, as Phillips claims, contend that Glen Point had a fiduciary duty to make certain disclosures under the OT Option contracts. Instead, by causing employees to send out confirmations that the OT Options had been triggered, without disclosing his manipulative trading activity, Phillips misled others because those statements falsely implied that Glen Point was acting in good faith and a commercially reasonable manner, and that the OT Option had been triggered as a result of natural market forces.

The gravamen of this claim is that the *confirmations*—not the statements in OT Option contracts—were misleading, which is a well-established basis for a wire-fraud claim. *See Autuori*, 212 F.3d at 118 (allowing wire-fraud claims based on "misleading" statements); Rest. (Second) Torts § 529 ("A duty to disclose can . . . arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure to avoid being misleading."); *see also supra* at 36-37 (collecting fraud cases based on misleading claims of entitlement to payment under contracts). There is no plausible fair-notice problem with this theory. It is fair to assume that reasonable people know that intentionally making misleading statements to obtain millions of dollars can be criminal. And as to whether Phillips knew the statements were misleading, that is a fact question for the jury: the Government will prove that Phillips had specific intent to defraud,

which is a powerful check on any possibility that he lacked notice he was doing anything wrong.

None of the decisions Phillips cites warrant dismissing the Indictment on vagueness grounds, much less doing so at the motion to dismiss stage. For one, the premise that a Due Process challenge can arise based on the language of a contract—rather than the statute—makes little sense. The question in a Due Process challenge is whether "the *statute* presents an ordinary person with sufficient notice of . . . what conduct is prohibited." *Houtar*, 980 F.3d at 273 (emphasis added). Here, that means the question is whether the wire-fraud statute is sufficiently clear to put a reasonable person on notice that a misleading statement could be unlawful. Any ambiguities in the statements or contracts at issue go to strength of the evidence, not to any question of a constitutional dimension. *See United States v. Shellef*, 732 F. Supp. 2d 42, 68 (E.D.N.Y. 2010) ("Any ambiguities or inconsistencies in the contract . . . go to the weight of the evidence . . . ."). Phillips cites no case within this Circuit that has evaluated a vagueness challenge based on the ambiguity of the alleged misstatement and doing so makes little sense with the doctrine.

Instead, Phillips cites three out-of-district cases, none of which support his position. The one Circuit decision he cites was not even a constitutional vagueness challenge: it simply found, in the context of a false-statements claim, that the Government had not proved falsity. *United States v. Race*, 632 F.2d 1114, 1119-20 (4th Cir. 1980). The two other district-court decisions Phillips cites provide no legal basis for evaluating a vagueness claim based on the nature of the alleged misstatements, rather than the statutes. And in any event, those decisions rejected the vagueness challenges at issue because they could not conclude, as a matter of law, that the alleged misstatements were not misleading. *See United States v. Gen. Dyn. Corp.*, 644 F. Supp. 1497, 1501-02 (C.D. Cal. 1986) (denying motion to dismiss); *United States v. Bryant*, 556 F. Supp. 2d 378, 448 (D.N.J. 2008) (same).

This case, in short, is one for the jury. The defendant violated well-established legal principles prohibiting fraud and manipulation. His arguments to the contrary are fundamentally fact disputes for trial, not for a motion to dismiss.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court deny the defendant's motions to dismiss the Indictment.

Dated: New York, New York
     May 26, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s_____
    Thomas Burnett
    Kiersten Fletcher
    Noah Solowiejczyk
    Assistant United States Attorneys